IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
March 18, 2025 Session

**CHARLES HARDY, JR. v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Knox County**
**No. 125403   Steven Wayne Sword, Judge**

_____

**No. E2024-00527-CCA-R3-PC**
_____

Petitioner, Charles Hardy, Jr., appeals the denial of his post-conviction petition, arguing that the post-conviction court erred in denying his claims that trial counsel was ineffective in advising him not to testify, and provided ineffective counsel pretrial and at trial. He also argues he is entitled to relief due to the cumulative effect of trial counsel's individual errors. Following our review of the record, the briefs of the parties, and oral arguments, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JILL BARTEE AYERS, J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Chelsea C. Moore, Knoxville, Tennessee, for the appellant, Charles Hardy, Jr.

Jonathan Skrmetti, Attorney General and Reporter; Johnny Cerisano, Assistant Attorney General; Charme P. Allen, District Attorney General; and Larry Dillon, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**Factual and Procedural Background**

Petitioner was indicted by the Knox County Grand Jury of first degree premeditated murder and tampering with evidence. After a jury trial, Petitioner was convicted as charged and was sentenced to life imprisonment for the first degree murder conviction and four years for the tampering with evidence conviction, to be served concurrently. This court affirmed Petitioner's convictions on appeal. *State v. Hardy*, No. E2021-00616-CCA-R3-CD, 2022 WL 2070267, at *1 (Tenn. Crim. App. June 9, 2022), *perm. app. denied* (Tenn. Oct. 19, 2022).

Petitioner beat and stabbed Kerry Dickinson, the victim, to death in a small efficiency apartment Petitioner shared with his fiancé and co-defendant, Kendra Ryan. The victim was a disabled Navy veteran who suffered a severe brain injury which reduced his cognitive level and diminished his impulse control. *Id.* The victim also struggled with alcoholism and was often homeless. *Id.* Petitioner and Co-defendant Ryan, who witnessed the attack, kept the victim's dead body in their apartment for nearly three days. *Id.* at *1-6. After officers were dispatched to the apartment on a report of a dead body, Petitioner and Co-defendant Ryan were arrested. *Id.* at *4-6. While police officers searched the apartment, Petitioner discarded a knife he used to stab the victim. *Id.* at *6.

Petitioner and Co-defendant Ryan each gave statements to the police. *Id.* at *5. Co-defendant Ryan testified as a State's witness. *Id.* at *1-3. On the evening of Sunday, May 20, 2018, Co-defendant Ryan and Petitioner met the victim at a nearby gas station and invited him to their apartment so the victim could sober up and shower. *Id.* at *1. Co-defendant Ryan testified that when Petitioner went to the bathroom, the victim began masturbating in front of her. *Id.* She told him to stop and to leave her apartment, but he refused. *Id.* When Petitioner heard Co-defendant Ryan yelling, he exited the bathroom and began hitting the victim. *Id.* This court summarized Co-defendant Ryan's testimony about the hitting as follows:

> [Petitioner] pulled the victim off the couch and began hitting him. The victim fell and landed on his back on the floor between the couch and the bed. [Petitioner] continued to use his fists to hit the victim's face. [Co-defendant] Ryan stated that she tried to make [Petitioner] stop hitting the victim, but [he] refused to do so. [Petitioner] then produced a knife that was on his person and cut the victim "everywhere" as the victim was "[j]ust laying there." [Co-defendant] Ryan described the knife as blue with the outside of the knife shaped "like a lizard." She said the victim did not have a weapon, did not attack [Petitioner], and did not try to hit him. She stated that [Petitioner] also struck the victim with a crutch that was in the apartment.

*Id.* Co-defendant Ryan testified that despite the beating, the victim was still alive and was moaning and talking to himself. *Id.* at *2. Petitioner insisted, however, that the victim was dead. *Id.* At no time did Petitioner or Co-defendant Ryan render assistance or call for help. *Id.* at *1-3. That first night they slept while the victim remained on the floor between their bed and the couch. *Id.* at *2.

Co-defendant Ryan testified that Monday, the next morning, the victim was in the same position on the floor. *Id.* She recalled that he was "still breathing." *Id.* When she asked Petitioner to wake the victim and tell him to take a shower, Petitioner insisted that the victim was dead. *Id.* In the afternoon, Co-defendant Ryan went to the bank alone

while Petitioner remained in the apartment. *Id.* When she returned, the victim was on the same spot on the floor. *Id.* She could not discern whether the victim was still breathing but observed more blood around the victim's body. *Id.*

The following evening Petitioner and Co-defendant Ryan went to a tobacco store and while there, Petitioner asked his friend who worked there for help moving a body. *Id.* Because the friend declined to help, Petitioner dragged the victim's body into the bathroom and covered him with a tarp because he did not want to see the victim's face as he was using the restroom. *Id.* Co-defendant Ryan testified that she later found two bloody knives underneath the bed. *Id.* at *3. She rinsed the knives and left them in the sink. *Id.* According to Co-defendant Ryan, Petitioner began to clean the apartment with bleach after he moved the victim's body into the bathroom. *Id.* at *2. Co-defendant Ryan confirmed that on the day of their arrest, Petitioner threw his knife on the ground near the apartment building. *Id.* at *3.

An autopsy revealed that the victim sustained fourteen sharp-force injuries, thirty-six blunt force injuries, and a cluster of injuries on his abdomen that were a combination of sharp-force and blunt force injuries. *Id.* at *7. The medical examiner testified that not all injuries occurred at the same time nor were they caused by the same kind of weapon. *Id.* at *7-8. One of the blunt force injuries to the victim's face and head left a cluster of multiple lacerations with a curved appearance consistent with the curved base of a lamp. *Id.* at *7. Some of the sharp-force injuries were consistent with a knife and some injuries indicated that the knife blade may have been serrated. *Id.*

The victim had a series of elongated, linear, superficial cuts and abrasions to the torso, the pattern of which was consistent with the blade of a ceiling fan found at the scene. *Id.* The victim also suffered a sharp-force injury to his back which fractured his chest cavity and punctured his lung. *Id.* The medical examiner testified that the blade of the knife had to have been at least four inches long to sustain this injury. *Id.* The lack of blood in the chest and around the punctured lung indicated that the victim's circulation was failing when he was stabbed in the back whereas the large amount of dried blood on his head and neck indicated that the victim's circulation was "effective" and "vigorous" when those injuries were sustained. *Id.* The medical examiner opined that despite the seriousness of the sharp-force and blunt injuries to the victim's head, face and ears, such injuries were survivable; those injuries occurred approximately twelve hours before the stab to the back. *Id.*

Petitioner did not testify at trial, but a recording of his interview with police was played for the jury. *Id.* at *5-6. While he initially denied that the victim was injured in the apartment, he later admitted to beating the victim with his fists and stabbing the victim with his knife: "I whipped out my knife. There's – there's no one faster [with] a knife than

I am. I whipped it out, and I went to stabbing him." *Id.* Petitioner did not recall the number of times he stabbed the victim but said it was not "that bad." *Id.* Petitioner admitted to striking the victim with the blade from a ceiling fan when the victim fell to the ground. *Id.* at *6. He admitted further to dragging the victim's body into the bathroom because he grew "tired of . . . walking over him." He placed a tarp over the victim's body so he did not have to see the face of a dead man "staring back at you." *Id.* Petitioner also admitted that he threw his "key chain knife" into the grass while he and Co-defendant Ryan were outside of the apartment. *Id.* Officers returned to the scene and located the knife where Petitioner said he had thrown it away. *Id.* at *7.

In his recorded statement, Petitioner said he believed the victim was going to beat him. *Id.* at *6. He punched the victim and continued to beat the victim with his fist. He then pulled out his knife while the victim was still upright. *Id.* He denied that he hit the victim with any other objects and denied that he intended to injure the victim. *Id.* He maintained that the victim died three days after he beat and stabbed him. *Id.*

After the State rested its case, the trial court conducted a *Momon*[1] hearing which the record reflects was held over two days. On the first day, Petitioner testified that he had met trial counsel on many occasions in preparation for trial, that he and trial counsel discussed his rights including his right to testify and that based on those discussions, Petitioner understood that he had an "absolute" right to testify or not to testify. Petitioner further said that he understood the defense theories advanced at trial and that he and trial counsel discussed the "pros and cons" of testifying. When the trial court asked him whether he had made a decision about what to do, Petitioner replied, "Not at this moment, no. But I was thinking more of leaning to testify myself." When the trial court asked Petitioner if he would like more time to discuss the matter with trial counsel, Petitioner responded that he would. The trial court then adjourned court for the day and instructed Petitioner to let the court know "tomorrow when we resume" the trial. The trial court then reiterated trial counsel's advice to Petitioner about his right to testify:

The [c]ourt: You know if you want to testify, that is your right to testify. Your lawyer can give you advice, but ultimately it's your decision on – on whether or not you want to testify. You understand that?

[Petitioner]: Yes, sir.

The [c]ourt: So he can tell you, "I don't think you should testify," and if you want to, you get to testify. He can say, "I think you should

---

[1] *Momon v. State*, 18 S.W.3d 152 (Tenn. 1999).

- 4 -

testify," and if you don't want to, he can't make you, and nobody else can. That is completely your decision. You understand that?

[Petitioner]: Yes, sir.

The following day, trial counsel informed the trial court that Petitioner would not testify. The trial court then again questioned Petitioner in a continuation of the previous day's *Momon* hearing:

The [c]ourt: All right. And is that your decision not to testify, [Petitioner]?

[Petitioner]: Yes, sir, it is.

The [c]ourt: And you're making that decision freely and voluntarily?

[Petitioner]: Freely and voluntarily, sir.

The [c]ourt: All right. Very good. Thank you, sir.

*Post-Conviction Hearing – March 4, 2024*

Trial counsel testified that he represented Petitioner at trial and on appeal and that Petitioner's case was not his first murder case. Trial counsel explained that it was his general practice to familiarize the client with the nature and severity of the charges, to file a standard discovery request, and to meet the client to discuss the case in more depth. Trial counsel explained further that while examining discovery, he would develop issues, constitutional or factual, and develop possible mitigation arguments by reviewing the client's social history. After trial counsel received discovery in Petitioner's case, he retained an investigator with whom he reviewed discovery and worked on trial strategy. He recalled that the investigator also met with Petitioner to review discovery with him.

The discovery included witness statements and the recorded interviews of Petitioner and Co-defendant Ryan taken at the Knoxville Police Department. Both Petitioner and Co-defendant Ryan had given "extensive statements after their arrest." Trial counsel recalled that Co-defendant Ryan's account of the events leading up to the attack in the apartment were "fairly consistent" with Petitioner's account.

Trial counsel did not file any pretrial motions. He testified that there were no grounds to suppress Petitioner's statement. Trial counsel was aware that Petitioner and Co-defendant Ryan had "a long documented history" of alcohol abuse but when they were

arrested a "couple of days after the fact," the police took them to the jail for showers and they "presented better" in the interview. He thought Petitioner was in "a fine mental state" for the interview. Additionally, the rights waiver form Petitioner signed appeared to be validly executed.

Trial counsel testified that it was a tactical decision not to test the knives found in the apartment or to retain an independent medical expert to challenge the medical examiner's findings about the victim's autopsy. He was concerned that testing the knives would likely inculpate Petitioner further. As for the autopsy, trial counsel explained that the trial strategy was to show that the killing was justified because he was trying to defend Co-defendant Ryan, not to challenge the medical examiner's findings. Furthermore, there was no assurance or indication that the findings of an independent medical expert would contradict the medical examiner's findings.

Trial counsel met with Petitioner "enough so that [he] was comfortable with him going to trial on such a serious case." They discussed the possibility of Petitioner's testifying. He did not recall conducting a "full-blown cross demo or anything like that" but his practice was to listen to the client's statement and go through it.

Recognizing that Petitioner's statement would be admitted as evidence, trial counsel advanced the theory that Petitioner was Co-defendant Ryan's "protector" and acted either in self-defense, in defense of third-party, or in the heat of passion and that the victim "spurred" the episode with his erratic behavior. Trial counsel explained that he wanted to give the jury "options" hoping that a juror would sympathize with Petitioner and find that Petitioner was justified in attacking the victim. Trial counsel acknowledged, however, that the "second act" of Petitioner was "pretty bad" because Petitioner and Co-defendant Ryan failed to notify law enforcement, left the victim's body on the floor for several days, and dragged it into the bathroom. Those facts supported the State's theory that the victim was still alive after the initial beating and that Petitioner dealt the victim "another death blow" in premeditation.

Trial counsel recalled that Co-defendant Ryan's trial testimony was "self-serving" and very damaging to Petitioner. Trial counsel had been unable to interview her prior to trial because she was represented by counsel who "laughed . . . off" trial counsel's request to interview her. At trial, Co-defendant Ryan insinuated that Petitioner stabbed the victim a second time when she left the apartment. Trial counsel recalled trying to impeach Co-defendant Ryan with her inconsistent statements.

Trial counsel testified that as they got closer to trial, and "even in the midst of trial" that Petitioner wanted to testify about "his recollection." Trial counsel was concerned that Petitioner wanted to testify "a lot different than his police statement." He thought

Petitioner's proposed testimony "was coming from a whole different angle and approach" than their trial strategy that Petitioner was acting as Co-Defendant Ryan's protector or in self-defense. Trial counsel recalled further that after the State rested its case, they had "the luxury of having a couple of hours" to discuss whether Petitioner would testify.

Petitioner testified that he punched the victim twice with his fists, hit the victim on the side of the head with a lamp, hit the victim with a crutch, and hit the victim's hands with a ceiling fan blade. He admitted to telling Mr. Underwood at the tobacco store that he thought the victim was dead and that he needed help moving his body. Petitioner testified that when he and Co-defendant Ryan returned from the tobacco store, the victim was still alive because he grabbed for the bottom of the bed post. When the victim refused to remove his hands from the bed post, Co-defendant Ryan began kicking him. As Petitioner tried to pry the victim's hands off the bed post, he saw a ceiling fan blade underneath the bed. He was confused as to how it got there but grabbed the ceiling fan blade and began hitting the victim's hands. He surmised that the blood splatter on the walls came from his hitting the victim with the ceiling fan blade.

Petitioner testified that Co-defendant Ryan told him not to move the victim from the apartment and claimed that Co-defendant Ryan insisted that the victim stay the night in the apartment. He agreed that he dragged the victim's body into the bathroom and put a tarp over it. When he and Co-defendant Ryan awoke the next morning, he remained in bed while Co-defendant Ryan went to the bathroom. When she returned, she asked Petitioner to check on the victim to determine whether he was still alive. Petitioner testified that he knew that the victim was dead because he was not breathing. He did not alert the authorities because his phone needed internet service to operate, and internet service was unavailable in the apartment.

Petitioner acknowledged that he had a pocketknife but denied that he stabbed the victim with his pocketknife or a kitchen knife. He testified that when the police came to the apartment, the pocketknife fell out of his pocket when he stood up. He kicked it onto the grass and had intended to collect it but was instructed by the officers to come with them. He testified that at the time of his police interview, he was unaware that the victim had been stabbed. He did not learn that the victim had been stabbed until he received discovery almost a year after the incident. Petitioner explained that he told the officers that he was "pretty good with [his] knife" and that "if [he had] wanted [the victim] dead for what he had done, he'd have been dead." Because he was skilled in using his knife, Petitioner maintained that he had no reason to use some other knife in the apartment. He was surprised to learn at trial that the kitchen knives were part of the State's proof.

Petitioner testified that trial counsel met with him "two and a half times" to discuss his case. According to Petitioner, trial counsel could not be bothered to listen to

Petitioner's account of what had occurred and was always taking notes as Petitioner spoke. Petitioner confirmed that he talked to the investigator trial counsel had hired and said that the investigator paid attention to him unlike trial counsel.

Petitioner was informed about the State's offer of a forty-year sentence but rejected it. Petitioner was already in his forties and a forty-year sentence would be like a life sentence. Moreover, he refused to serve a forty-year sentence for "something [he] didn't do." However, he conceded that he would have pled guilty had he received a ten-year or fifteen-year sentence.

Petitioner said that he and trial counsel discussed the possibility of Petitioner's testifying. Trial counsel advised against testifying fearing that Petitioner would receive a longer sentence. Petitioner wanted to testify because he wanted to tell the jury "the truth." He decided not to testify on the recommendation of trial counsel. He testified that had he "known it was going to get me a life sentence, I'd have just went ahead and got up there and told them what I'm telling you now."

Petitioner accused Co-defendant Ryan of lying during her testimony. He denied that he stabbed the victim or used his knife or the two knives found in the kitchen sink. He denied that he was trying to kill the victim.

On cross-examination, Petitioner acknowledged that his post-conviction testimony was not the same account he gave to the police. Prior to trial, Petitioner filed a motion to recuse trial counsel because trial counsel was not listening to him and did not retain an expert to lift fingerprints off the knives found in the kitchen sink. The motion was denied.

The post-conviction court made extensive findings of fact in its written order denying post-conviction relief concerning each claim raised by Petitioner. The post-conviction court ultimately resolved any credibility issues between Petitioner and trial counsel in favor of trial counsel and found that Petitioner failed to prove ineffective assistance of counsel by failing to prove either deficient performance or prejudice. It is from this judgment that Petitioner now appeals.

**Analysis**

I. <u>Ineffective Assistance of Counsel</u>

On appeal, Petitioner claims the post-conviction court erred in denying him relief on his claim of ineffective assistance of counsel. He argues that trial counsel was ineffective by failing to file any pretrial motions, by failing to adequately communicate with him to prepare for trial, and in advising him not to testify at trial. The State responds

that trial counsel communicated with Petitioner and prepared for trial, pursued a valid trial strategy, advised Petitioner not to testify at trial based on informed preparation, and that the evidence does not establish any facts supporting deficiency and prejudice. We agree with the State.

Under the Post-Conviction Procedure Act, a criminal defendant may seek relief from a conviction or sentence that is "void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103. Because the right to effective assistance of counsel is safeguarded by the Constitutions of both the United States and the State of Tennessee, the denial of effective assistance of counsel is a constitutional claim cognizable under the Post-Conviction Procedure Act. *See* U.S. Const. amend. VI; Tenn. Const. art. I, § 9; *Howard v. State*, 604 S.W.3d 53, 57 (Tenn. 2020).

"Appellate review of an ineffective assistance of counsel claim is a mixed question of law and fact that this Court reviews de novo." *Phillips v. State*, 647 S.W.3d 389, 400 (Tenn. 2022) (citing *Dellinger v. State*, 279 S.W.3d 282, 294 (Tenn. 2009)). As an appellate court, we are bound by the factual findings of the post-conviction court unless the evidence in the record preponderates against those findings. *Howard*, 604 S.W.3d at 57 (citing Tenn. R. App. P. 13(d)); *see also Arroyo v. State*, 434 S.W.3d 555, 559 (Tenn. 2014); *Fields v. State*, 40 S.W.3d 450, 456 n.4 (Tenn. 2001). The same does not hold true for the post-conviction court's conclusions of law which are reviewed de novo with no presumption of correctness. *Howard*, 604 S.W.3d at 57; *Holland v. State*, 610 S.W.3d 450, 455 (Tenn. 2020).

When a claim of ineffective assistance of counsel is made, the burden is on the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see Lockhart v. Fretwell*, 506 U.S. 364, 368-72 (1993); *Kendrick v. State*, 454 S.W.3d 450, 457 (Tenn. 2015). Deficient performance is representation that falls below "an objective standard of reasonableness" as measured by prevailing professional norms. *Kendrick*, 454 S.W.3d at 457 (quoting *Strickland*, 466 U.S. at 688); *see also Baxter v. Rose*, 523 S.W.2d 930, 932-33 (Tenn. 1975). Under *Strickland*, this court starts with "the strong presumption" that counsel exercised reasonable judgment in all significant decisions. *Kendrick*, 454 S.W.3d at 458 (citing *Strickland*, 466 U.S. at 689).

To show prejudice, a petitioner must demonstrate a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different. *Strickland*, 466 U.S. at 694; *Kendrick*, 454 S.W.3d at 458. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Reasonable probability is a lesser burden of proof than

preponderance of the evidence. *Kendrick*, 454 S.W.3d at 458 (citing *Williams v. Taylor*, 529 U.S. 326, 405-06 (2000)). When the proof of guilt is overwhelming, proving prejudice is exceedingly difficult. *See Proctor v. State*, 868 S.W.2d 669, 673 (Tenn. Crim. App. 1992); *Bray v. State*, No. M2011-00665-CCA-R3-PC, 2012 WL 1895948, at *6 (Tenn. Crim. App. May 23, 2012) (finding that, in light of overwhelming evidence, petitioner could not demonstrate prejudice); *McNeil v. State*, No. M2010-00671-CCA-R3-PC, 2011 WL 704452, at *6 (Tenn. Crim. App. Mar. 1, 2011) (finding that overwhelming evidence of guilt precluded showing of prejudice from admission of evidence at trial).

Failure to satisfy either prong results in the denial of relief. *Strickland*, 466 U.S. at 697; *Nesbit v. State*, 452 S.W.3d 779, 786-87 (Tenn. 2014). Accordingly, if either factor is not satisfied, there is no need to consider the other factor. *Finch v. State*, 226 S.W.3d 307, 316 (Tenn. 2007) (citing *Carpenter v. State*, 126 S.W.3d 879, 886 (Tenn. 2004)). "[T]he petitioner is required to prove the fact of counsel's alleged error by clear and convincing evidence." *Phillips*, 647 S.W.3d at 401 (quoting *Dellinger*, 279 S.W.3d at 294); *see also* T.C.A. § 40-30-110(f); Tenn. Sup. Ct. 28, § 8(D)(1).

**Pretrial**

In terms of Petitioner's claim that trial counsel was ineffective pretrial in the number of times he met with Petitioner and his failure to prepare for trial and develop a trial strategy, the post-conviction court rejected Petitioner's testimony and found to the contrary:

> The context of their other conversations indicates that [trial counsel] was certainly concerned about forming an effective defense. [Petitioner] also testified that he only met with [trial counsel] two and a half times. The court does not find [Petitioner] credible in this testimony. He acknowledged that [trial counsel] would often take notes when they met, discussed multiple times whether [Petitioner] should take a plea deal, discussed witnesses, discussed whether [Petitioner] would testify, and discussed motions to file. These topics would have taken many meetings to discuss.

As this court has held, the number of meetings with trial counsel is irrelevant in determining whether trial counsel communicated adequately with a petitioner. Rather:

> an analysis of trial counsel's performance in consulting with a client is directed to how trial counsel was able to impart and receive important information – such as, among other things, the facts of the case, the application of the law, significant case developments, and the petitioner's

- 10 -

objectives – so that counsel and the petitioner could make informed decisions about the case.

*Hall v. State*, No. M2021-01555-CCA-R3-PC, 2023 WL 2726780, at *7 (Tenn. Crim. App. Mar. 31, 2023), *no perm. app. filed*. Here, Petitioner has not shown that additional meetings would have led trial counsel to be better prepared for trial, affected the development of trial strategy, or helped him make a knowing and voluntary decision about testifying and how to proceed with the case. *See Tate v. State*, No. W2019-01380-CCA-R3-PC, 2020 WL 1972586, at *4 (Tenn. Crim. App. Apr. 24, 2020); *Williams v. State*, No. M2007-02070-CCA-R3-PC, 2008 WL 5272556, at *5 (Tenn. Crim. App. Dec. 19, 2008); *McWilliams v. State*, No. E2017-00275-CCA-R3-PC, 2017 WL 5046354, at *4 (Tenn. Crim. App. Nov. 2, 2017).

Regarding Petitioner's claim concerning trial counsel's failure to file a motion to suppress Petitioner's statement to police, Petitioner has not overcome the strong presumption that trial counsel exercised reasonable judgment. To establish a claim of ineffective assistance of counsel based on a failure to file a motion to suppress, a petitioner must prove (1) that a suppression motion would have been meritorious, (2) that "counsel's failure to file such motion was objectively unreasonable[,]" and (3) that "but for counsel's objectively unreasonable omission, there is a reasonable probability that the verdict would have been different absent the excludable evidence." *Phillips*, 647 S.W.3d at 404. Trial counsel testified that he filed no pretrial motions. He specifically decided against a suppression motion because there were no legal grounds to support the motion and, as discussed below, the statement gave the jury Petitioner's view of the attack without exposing him to cross-examination. Petitioner has not demonstrated that a suppression motion would have been meritorious, that trial counsel's failure to file a suppression motion was unreasonable, and that but for counsel's failure, there was a reasonable probability that the verdict would have been different absent his statement. Even without Petitioner's statement, Co-defendant Ryan's eyewitness account of the attack, the bloody crime scene, the autopsy findings, and Petitioner's admission to someone at the tobacco store that he killed someone provided overwhelming proof of Petitioner's guilt. *See Phillips*, 647 S.W.3d at 404.

Insofar as to the claims concerning trial counsel's failure to request another autopsy and failure to test the knives found in the sink, Petitioner failed to produce any evidence at the post-conviction hearing that a medical expert or an independent autopsy, or testing the knives found in the kitchen would have uncovered any information favorable to Petitioner. "[P]roof of deficient representation by omission requires more than a speculative showing of a lost potential benefit." *Owens v. State*, 13 S.W.3d 742, 756 (Tenn. Crim. App. 1999). Quite the opposite, trial counsel feared that another autopsy would only confirm the findings of the State's medical examiner and testing the knives would further inculpate

Petitioner. The evidence does not preponderate against the post-conviction court's findings that trial counsel did not provide ineffective assistance of counsel on pretrial matters.

## Trial

Petitioner also claims that trial counsel failed to adequately prepare for trial. However, the record reflects that trial counsel reviewed discovery, discussed it with Petitioner, and worked with an investigator to develop a trial strategy. Trial counsel testified that he met with Petitioner multiple times sufficient for trial counsel to feel "comfortable" for trial preparation. Based on Petitioner's recorded statement, trial counsel devised a strategy that conceded Petitioner's role in the victim's death but justified Petitioner's actions as an act of self-defense or defense of Co-defendant Ryan, or as an act in the heat of passion due to adequate provocation. To that end, the trial court instructed the jury on self-defense over the State's objection.

Contrary to Petitioner's assertion, the State's theory of a "second attack" did not come as a surprise to trial counsel. Trial counsel acknowledged that the theory of self-defense was better suited to rebut the first attack. However, the record reflects that trial counsel argued that the victim's injuries were the result of "one sustained attack" to rebut the State's theory of premeditation based on a "second attack." Trial counsel cross-examined the medical examiner on the possibility that the lack of blood in the victim's chest cavity may have been caused by the gravity leaking the blood on the floor because the victim was in a supine position as opposed to an upright or standing position. "The fact that a particular strategy or tactic failed or hurt the defense, does not, standing alone, establish unreasonable representation." *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996). The evidence does not preponderate against the post-conviction court's finding that trial counsel's defense strategy was reasonable and based on informed preparation.

## Right to Testify

Petitioner claims that trial counsel's most egregious deficiency was trial counsel's advice that Petitioner not testify at trial. He argues that such advice constituted "incorrect legal advice and unreasonable trial strategy." As discussed above, Petitioner claims that the State advanced a "new theory" at trial that he stabbed the victim a second time, without provocation, when Co-defendant Ryan left the apartment. He argues that the best proof to rebut the State's theory would have been for Petitioner to testify. Petitioner also claims he was unable to make an informed decision about whether to testify because trial counsel did not prepare him by practicing direct and cross-examination of his proposed testimony. Concerning this issue, the post-conviction court found:

[Trial counsel] testified that during their pretrial meetings [Petitioner] was not adamant about testifying at trial. They did discuss the possibility and what he would say if he took the stand. [Trial counsel] was concerned that [Petitioner] would testify contrary to his statement to the police which would be used to impeach him during trial. [Petitioner] was repeatedly told that the decision was his to make. [Trial counsel] gave him sound advice based upon the facts and what [Petitioner] indicated he would say as a witness.

The evidence does not preponderate against the post-conviction court's findings. Petitioner's denying that he had stabbed the victim and accusing Co-defendant Ryan of doing so was not a plausible alternative to the theory advanced at trial. Instead, it would have undermined the strategy of giving the jury options either to acquit or to convict Petitioner of a lesser offense. Although trial counsel was concerned about Petitioner's statement regarding his prowess in using his pocketknife, trial counsel testified that the recorded statement was important in giving the jury a view of the facts from Petitioner's point of view. Testifying contrary to his statement would have exposed Petitioner to impeachment and the perils of cross-examination. Trial counsel's advice against testifying was not deficient.

Likewise, trial counsel's advice to Petitioner was not prejudicial. Nothing in Petitioner's post-conviction testimony shows that Petitioner's testifying would have altered the outcome of the case. Specifically, nothing in the proof shows that Co-defendant Ryan was in any way involved in stabbing the victim or that the jury would have believed Petitioner that despite admitting to striking the victim with his fists, a lamp, a crutch, and a ceiling fan blade, he did not stab the victim with his pocketknife which appeared to have blood on the blade. Additionally, the post-conviction court found Petitioner not to be credible when he testified that during the interview, he was unaware the victim had been stabbed and only learned of the stabbing after he received and reviewed discovery. Additionally, the evidence against Petitioner was overwhelming. In his statement to police, Petitioner admitted to beating and stabbing the victim. Co-defendant Ryan gave an eyewitness account of the attack and her suspicion that the victim was still alive when she left for the bank, but clearly dead when she returned from the bank. The autopsy showed that the sharp-force blunt injuries to the victim's head, face, and ears occurred when the victim was still alive and that despite the seriousness of those injuries, they were survivable. The medical examiner testified that the victim remained alive after the facial and head wounds. The sharp-force injury to the victim's back which punctured his lung occurred approximately twelve hours after the initial stabbings to his face and head.

Moreover, Petitioner made an informed decision not to testify with the advice of counsel. Petitioner avers that his decision not to testify was uninformed because trial counsel failed to conduct a mock examination of his testimony. When a defendant elects

- 13 -

not to testify and to waive his fundamental constitutional right to do so, a *Momon* hearing is required in which counsel addresses the defendant on the record, out of the presence of the jury, to question the defendant to ensure that the defendant understands that: (1) defendant has the right not to testify, and if the defendant does not testify, then the jury or court may not draw any inferences from the defendant's failure to testify; (2) the defendant has the right to testify and that if the defendant wishes to exercise that right, no one can prevent the defendant from testifying; (3) the defendant has consulted with his or her counsel in making the decision whether or not to testify; (4) the defendant has been advised of the advantages and disadvantages of testifying; and (5) the defendant has voluntarily and personally waived the right to testify. 18 S.W.3d at 162.

The record supports the finding that Petitioner was fully informed of the pros and cons of testifying and understood that regardless of trial counsel's advice, the decision was his alone. At the *Momon* hearing, Petitioner testified that he had met trial counsel on many occasions in preparation for trial, that he and trial counsel discussed his rights including the right to testify and that based on those discussions, Petitioner understood that he had an "absolute" right to testify or not to testify. Petitioner said that he understood the defense theories advanced at trial and that he and trial counsel discussed the pros and cons of testifying. The transcript of the *Momon* hearing corroborates trial counsel's testimony that he and Petitioner had plenty of time and opportunity to discuss whether Petitioner should testify as the trial court allowed Petitioner to consider the issue overnight. *Cf. Momon*, 18 S.W.3d at 163 (finding that the appellant's right to testify was violated where among other things, counsel unilaterally decided not to call the appellant as a witness, "merely informed the appellant of his decision as they were entering the courtroom," and the appellant had little time or opportunity to discuss or question the decision). The evidence does not preponderate against the post-conviction court's findings.

## II. Cumulative Error

Finally, Petitioner contends that he is entitled to relief based upon the cumulative effect of trial counsel's multiple instances of deficient performance and that he was prejudiced by same. "When an attorney has made a series of errors that prevents the proper presentation of a defense, it is appropriate to consider the cumulative impact of the errors in assessing prejudice" of an ineffective assistance of counsel allegation. *McKinney v. State*, No. W2006-02132-CCA-R3-PD, 2010 WL 796939, at *37 (Tenn. Crim. App. Mar. 9, 2010). More than one instance of deficient performance, when considered collectively, can result in a sufficient showing of prejudice pursuant to *Strickland*. *Id.* The question is whether counsel's deficiencies "cumulatively prejudiced the. . . right to a fair proceeding and undermined confidence in the outcome of the trial." *Id.* Here, we need not consider the cumulative effect of any alleged errors because Petitioner has failed to demonstrate

multiple errors, much less a single error in any of his issues. *See also State v. Herron*, 461 S.W.3d 890, 910 (Tenn. 2015). Petitioner is not entitled to relief

## CONCLUSION

Based on the foregoing reasons, the judgment of the post-conviction court is affirmed.

s/ *Jill Bartee Ayers*

JILL BARTEE AYERS, JUDGE